Well, the next case, Post v. St Paul Travelers Insurance Co., numbers 10-388 and 3300. This is one where we switched counsel and have Mr. Byer going first before Mr. Pachetto, even though there are cross appeals here, because we anticipate having significantly more questions of St Paul Travelers Counsel than we do of Post Counsel. Robert Byer Thank you, Your Honor. Having just learned this morning that the switch was made, I'm not sure whether I get rebuttal. Judge Pachetto You'll get rebuttal. Robert Byer Okay. I would like to reserve Judge Pachetto You are Robert Byer I'm Robert Byer representing Judge Pachetto You'll get rebuttal. Robert Byer Okay. I'd like to reserve three minutes for rebuttal. Judge Pachetto That's fine. Robert Byer Thank you very much. May it please the Court, I am Robert Byer. I represent St Paul Travelers. This case involves the scope of an insurer's with respect to a sanctions petition under a legal malpractice policy that expressly excludes sanctions from coverage. Under the plain language approach that the Pennsylvania Courts and this Court follows with respect to the interpretation of an insurance policy you have what Mr. September 25 of 05, Mr. Saxton calls after this trial and says to counsel or I guess pose that you better let your insurance carrier know. Robert Byer Yes. Judge Pachetto We've got a major problem. Robert Byer Yes, Your Honor. Judge Pachetto And then there's a follow-up and then there's a bunch of letters from Mr. Williams. Is that correct? Three or four letters? Robert Byer Yes. Mr. Williams from Mercy and Hospital. Judge Pachetto And by the way, just as an aside, can you read the letter, the October 12 letter as opposed to the first and the second letters? Robert Byer I think it was the October 12 letter that made the comment that Post's representation forced the tender of policy limits. It was a Judge Pachetto It was a claim, right? Wasn't that the first language of claims? Robert Byer The first Judge Pachetto Well, the September 25 telephone call I guess was to Barton Post. Robert Byer There was a Judge Pachetto The claim should be reported to Post's insurance carrier. So it sounds like the words claim was used. Robert Byer That is correct. The first letter that actually told Mr. Post to notify his insurance carrier, I believe was the October 20, 2005 letter from Mr. Williams. There was definitely a claim with respect to malpractice liability and there is no dispute with respect to that. And whether St. Paul Travelers was put on notice of that earlier on the telephone conversation to which Your Honor mentioned or one of the October letters, there is no doubt that there was a claim asserted for legal malpractice liability. Robert Byer Right. So to move things along, we've got a claim, okay? We've got a sanctions petition that asks for sanctions and quote unquote another relief, which is important here. Are we talking about this? Judge Pachetto That's Mercy in February of 2006. They're asking, they're making both of those claims. Robert Byer Right. Judge Pachetto That's correct. Robert Byer And you're talking about, are we talking about the same conduct, the very same conduct of the lawyers, be it in the context of this quote unquote sanctions petition or in the malpractice? Judge Pachetto Quite possibly, Your Honor. I'll just mention that there was not a complaint filed at that point for legal malpractice. So we're not sure precisely what the contours would be of any malpractice suit, which was not filed  Robert Byer But you don't need a filing, do you? Judge Pachetto No, you need a claim. Robert Byer It's a claim or suit, right? Judge Pachetto But in terms of the sanctions petition Robert Byer And this is a claim. Judge Pachetto The sanctions petition is expressly excluded. There's the malpractice claim. Sanctions petition is by the Bobbitts, not by the hospital. Now the hospital files an answer in which I think, to which I think Your Honor was referring. But the question is whether that answer could possibly request covered loss under this policy. And I would suggest that the answer to that is no for a couple of reasons. First, as a matter of Pennsylvania civil procedure, it would have been impossible for that answer to substitute as a complaint in a medical malpractice claim. There would not have been any opportunity for Mr. Post or the other potential defendants to have a trial by jury. There simply are no pleadings filed at that point. Also, the certificate of merit requirement of the rules of civil procedure would not have to be complied with. Furthermore, and I think perhaps even more importantly, Mercy Hospital itself disclaimed any notion that it was attempting to seek damages in the nature of malpractice damages through that answer. It's just trying to make sure that in the sanctions proceeding the blame gets laid at Post's feet instead of the client's feet, the lawyer's feet instead of the client's feet. I think that that's part of it. Mercy wanted to participate in the discovery because its own witnesses were being deposed. And these are witnesses, by the way, who previously had been cautioned by Judge Olszewski that they could be subject to criminal liability. Criminal defense counsel was brought in as part of the original proceeding during the medical malpractice trial. So Mercy is concerned about its witnesses. Also, Mercy is being subpoenaed. It's having discovery taken of its people as part of the sanctions proceeding. It's running up expenses. Mr. May, the hospital's chief executive officer, on February 9, 2006, three months after the filing of Mercy's answer, Mr. May is deposed. During his questioning by Mr. Boqueto, counsel for Mr. Post, Mercy's counsel objected to Mr. Boqueto questioning Mr. May on the basis of these are questions that relate to a potential malpractice claim, not a sanctions issue. Mr. May went on to answer, and this is at page 443 of the appendix. Mr. May went on to answer that he testified that Mercy was seeking its costs in the sanctions proceeding, not damages based upon its settlement to the Bobbitts. There is an even more succinct statement of Mercy's petition with respect to the sanctions proceeding on page 838 of the appendix. This is in a brief that Mercy filed in the Pennsylvania Superior Court in opposition to Post's petition for permission to file an interlocutory appeal. Mercy states as follows in that brief, quote, the claim by Post that Mercy hopes to obtain malpractice damages in the sanction proceedings is false. Mercy's request for damages is limited to fees and costs that it has incurred in the sanction proceedings, close quote. That's on page 10 of that brief. That brief was filed on May 25, 2006, six months after the sanctions petition and three months after Mr. May's deposition where Mr. May already had stated they weren't seeking this. Even if we were to agree with you that some portion or even the majority of the sanctions proceeding is not a covered event because of the exclusion, it can't be the case, can it, that the existence of the sanctions proceeding entirely vitiates the claim that was a covered event under the policy that preceded the sanctions proceeding? It does not vitiate the claim. The question is whether the hospital, I'm sorry, whether Mr. Post is defending the claim or defending the sanctions petition. Why isn't it, and didn't the trial judge say, well, it's sort of both here? The trial judge found that they were related by agreeing to conflate the sanctions petition with the legal malpractice claim, which had not been reduced to a lawsuit at that point. The policy is very expressed in terms of what there is a duty to defend. There's a duty to defend against a covered loss. Sanctions would not be a covered loss. Now, if we say that because there are potential, and I hate to use this word because of the first argument we just heard, collateral consequences of this sanctions petition with respect to a malpractice claim, how do we, what is the limiting principle? But here we have, we're all looking at the same conduct, perhaps through different lenses. Isn't there some possibility that the trial judge, even in a sanctions proceeding, might come up with some sort of a finding that could prejudice him? I guess your friend uses collateral estoppel effect, but hurt him in the malpractice case? That is a possibility, but the fact that there is a collateral estoppel potential is not a basis for saying that there is a duty to defend. There is simply no case that goes that far. Under Pennsylvania law, there is no case that any party cites in its brief, even the trial judge in reaching that conclusion, cited to a PLI publication, in which the lawyer said that this is problematic, and frankly, a couple of pages before the reference that she makes, they indicate that these collateral proceedings probably would not be covered. Once we, part of the problem starts at the outset, when Mr. Spinelli gives to his counsel, Mr. Anesh, information regarding the claims that Mercy made. He didn't tell him about the claims that Mercy made in September, October, November of 2005, but he only sent Anesh the petition for sanctions and asked for a coverage opinion with respect to that, and almost like it was putting the rabbit in the hat, wasn't it? Well, Mr. Anesh became aware of the malpractice claim. He said that, I think to be precise in terms of his deposition testimony, he did not recall whether definitely or not he had seen these letters, and this is where there's a conflict between Mr. Post's opening brief and the record in this case. In the opening brief, for example, on page three, without any citations of the record, there is a statement that the coverage counsel acknowledged that his opinion would have been different had he known of the claims letters. The record is completely to the contrary. Mr. Anesh testified in his deposition, and this is at page 1470 of the appendix, that he was the point. The point that I think Mr. Boccetto makes it. Is it Boccetto or Bocchetto, by the way? I'm sorry. Boccetto. Boccetto, sorry. The point that he's making in the brief is didn't travelers, quote, filing of the sanctions petition as an excuse for disclaiming coverage of the broader malpractice claim, close quote. And at that point, isn't that the right question? That is a question, but Mr. Anesh testified that it would not have made any difference to his coverage determination because the sanctions petition could not have given rise to any possibility of a covered loss because of the sanctions exclusion. And there simply was no authority for conflating the sanctions petition with the malpractice claim at that point. Stepping back for a minute, doesn't our case law state that if there's an ambiguity, basically if there's a tie it goes to the runner who would be the insured? If there's an ambiguity in the policy language, it is construed against the insurance carrier and in favor of the insured. I would suggest that there is no ambiguity in this policy language. The policy is very clear in terms of what is covered. It is very clear in terms of what is not covered. The confusion results from the attempt to conflate. The conflation is because they're trying to avoid the exclusion. Well, we have a factual conflation, though, don't we? I mean, we have a claim that precedes the sanctions proceeding. We have a covered claim, right? Yes. And we have an excluded sanctions proceeding, and we've got some bleed between the two. Especially with your answer on February 8th. Well, with the answer, the answer could not possibly have sought covered damages. The answer. It would ask to enter any other relief that this Court deems just and equitable under the unique and serious circumstances presented before it. Under the four corners rule that Pennsylvania applies and that this Court has applied sitting in diversity, the wherefore clause with that type of broad boilerplate language is not considered. You look at the factual allegations that are pleaded, and you look at whether that could be a covered claim based upon who's making that assertion. And here it's the Bobbitts and with the hospital joining in it for the purpose of recovering its own expenses. What about the scope of the damages allowed under a claim? Does that inform the analysis that we have to go through here? Because I'm a little bit confused as to what exactly that covers. In the language defense expenses, it appears to encompass only a very small range of fees and costs. What are we to make of that? Well, I think we're talking about. What good is it, I guess, if I'm insured and my claim is covered, but it covers only a very narrow band of expenses and costs, what good is it? To answer, I think Your Honor is asking two questions. First, the question of what damages are covered. The policy says that damages consist of compensatory damages. Well, that's for a suit, though. Are they different for suit and claim? That's for a suit or a claim. Defense expenses, the question is, defense expenses defined include fees, costs, expenses that result directly from the investigation, defense, or appeal of a specific claim or suit. In terms of the defense expenses, yes, Your Honor. So there's a lot of costs and fees incurred in connection with the claim made, and then you put yourself in the other side's position. Once you file that answer on February 8th, what are they to think you're after? You're making some sort of claim as well, are you not? If Heffernan says, Heffernan is a Pennsylvania Superior Court that sided in the briefs. If Heffernan says that you can rely upon subsequent discovery to expand the case in order to see that there's a duty to defend. But this is the opposite of Heffernan. The discovery that was taken right after the filing of that answer shows that there was no possibility of a covered claim being involved. There was no suit at that point. The claim has been asserted, but you have a sanctions petition being filed by the Bobbitts and then the hospital trying to recover its own expenses. The fact that there is some relationship, this is like the criminal cases that we cite in our briefs. The fact that there is a potential of collateral estoppel arising from those cases has never been held to create a duty on the part of the insurance carrier to defend those cases. Where do we draw the lines in terms of this carrier trying to limit its exposure by bargaining for this exclusion for which the premiums are reduced from what it would have been otherwise if you could imagine coverage that would encompass sanctions. My own firm has such a policy. With the benefit of that bargain, you cannot conflate these two proceedings. And that was Erie's position. I mean, that was the position of travelers. We would suggest that that's a reasonable construction of the policy. There is no ambiguity and that the trial court erred in ruling to the contrary. Thank you. We'll get you back in rebuttal and then on rebuttal you can also deal with the bad claim made. Thank you, Your Honor. Mr. Pichetto. Good morning, Your Honor. George Pichetto on behalf of the insured. Thank you, Your Honors. May it please the Court. I was very gratified to hear Mr. Byers say that there's no question but that there was a covered claim here. Because that really is the starting point of this case. And once you have a covered claim, then if you have now if you have just see if we got this correct. If you have a covered claim for malpractice, that's one thing. If you have the Bobbitts bringing a claim for sanctions, let's say Mercy did not enter into this and so it didn't muddy the waters. You're not saying that that sanctions claim is covered under this policy? I'm not and that's not this case. I understand. So what happened was that the Bobbitts filed a claim. Travelers wanted to be involved in a deposition. They were. And the Court probably made the wise decision, okay, look, you can be involved in this, but you've got to file an answer like you're a party. And they file an answer and they put at the end, they said, we want sanctions. And then they put the boilerplate that you and I in private when I was in private practice put in 200 times, 300 times. 2,000 times. We just don't even think about it. We just do it. And you're saying, okay, that makes the sanctions proceeding, it changes color. It now becomes one that's covered under this policy because it's a claim or suit and it's not just sanctions. It's a toughie, but you've prevailed so far. Well, but here's where I think it gets a little easier, Judge. All the reasons that Mr. Byers suggests why the sanctions proceedings couldn't give relief to Mercy in the form of malpractice claims or that it's just boilerplate as we've all seen it or it was just a routine thing that the judge asked them to file a pleading, it all may be true. I'll accept it for purposes of this argument. The fact is, though, that if you are the defense counsel on the preexisting malpractice claim, boilerplate or not, you still have to show up and say preliminarily objective Mercy's pleading in the sanctions proceeding and say there's no certificate of merit, there's no request for the proper types of damages and so on and so forth, and that's providing a defense. Why do you have to do that? You haven't sued your client for malpractice. No, they haven't. Why does the insurer do that? They have, Judge. What Mercy... By the boilerplate, any additional relief that the court might see fit to give us, that tells the carrier that they need to defend? It tells Post that he could be held responsible for damages to its client. Damages to its client, Mercy, whether it was pursuant to boilerplate or not, is a covered loss under this policy which gives rise to a duty to defend. If Mercy says in howsoever stumbling way or boilerplate way in some kind of filing in a court, my lawyer did wrong, and this is affirmative statements that Mercy made in its answer in the sanctions proceeding. It should sue its lawyer. It has. We don't need to make it more complicated than it is. If Mercy believed its counsel committed malpractice, then it files a garden variety legal malpractice suit, and this insurance company has to answer the bell from the moment that that's filed and cover all the costs. And I think the point is, Judge, that when they file that answer in the sanctions proceedings, defense counsel has to treat that as a form. However improper... You're saying we should hold as a matter of law that the answer filed in the sanctions proceeding was tantamount to a legal malpractice complaint? The answer filed in the sanctions proceeding was a legal proceeding seeking damages by a client against its lawyer, and that is expressly covered. It wasn't a suit. The policy says suit. The policy says that the costs incurred in the suit, cost of proceedings involved in the suit. I agree. Why shouldn't we interpret the suit to be the legal malpractice action that the client filed against the lawyer rather than this sanctions proceeding? Just because that's not the only kind of suit that could be filed against this lawyer. A malpractice case is one kind of suit, and that's clearly covered. And a sanctions proceeding is another kind of suit. If your client participates in it, if your client makes affirmative statements, as Mercy did, that you did wrong, and if your client, even by way of boilerplate, says, and I want my damages, my attorney's fees, and every other form of relief that the court deems just, you are in a suit. It may not be a good one. But if the sanctions proceeding is such a suit, then you run headlong into the more specific exclusion in the policy that says sanctions proceedings aren't covered. Well, but I don't believe, Your Honor, that Mercy only sought sanctions. They sought other things. And while I agree with Your Honor, it's an albatross of a way to proceed, and it's certainly not conventional. But if Mercy has words in its pleading that says relief beyond just sanctions, someone's got to defend it. Why shouldn't we treat this as any typical case where someone who might have a good civil claim allows the other case to proceed? I mean, I know I did it. Maybe my colleagues did it. I mean, when you have a good civil case against someone and that person is in criminal jeopardy, you just let the criminal case play out. Absolutely. You monitor it. And now you have to. But there's a guilty verdict because then you're getting liability. You're golden. You're just focused on damages, right? And the difference is this is different because, in that example, your client is not a party to those proceedings. The Commonwealth or the United States government is bringing those criminal proceedings. And you're right. The policies don't cover it. And I agree with Mr. Byard. That wouldn't be covered. But that's not our case. Our case is our client gets involved in a legal proceeding in Luzerne County, files a legal pleading that says, Ben Post, you did this wrong. You did that wrong. You did this wrong. You did that wrong. We suffered the damages, and now we want relief. Are you talking about the November 2007 precipice? No. What I'm talking about is the specific pleading that they filed in February. In February 8th. Right. Can I ask you, at what time does the duty to defend arise in your view? In my view, the duty to defend arose not later than October 20th, when there's a formal letter from Mr. Williams of Mercy Catholic to Mr. Post saying, put your carrier on notice. This is to formally advise you we're making a malpractice claim. It might have been as early as when they told Barton Post about it weeks earlier, but certainly not later than then. Yeah, they did tell him on September 25th, put your carrier on notice. If I may just follow up on that answer, Your Honor, and that's why that's significant, because if the duty to defend arises then, and I think we're all agreed that it does, and I'm the lawyer for Ben Post, and then I see Mercy file pleadings in a county court asking for some kinds of damages, I'm committing malpractice as Ben Post's lawyer if I'm not defending that request. And that very basis is why St. Paul's had a duty to defend. But does the duty to defend then, maybe it arises when Mercy files that response or joins it? Well, I think it does, Judge, but here's what the lower court found, and these are specific findings of fact, which I must point out, some of the factual advances in this argument by Mr. Byer contradict the specific findings of fact of the lower court. But here was the lower court's specific findings of fact, that Mercy was involved in the proceedings before it actually filed its pleading in February of 2006. How were they involved? They were involved in seeking discovery, taking depositions. They were obviously working with Bobbitt's counsel to advance this stalking horse. Let's go back to after February 8th. Yes. Before we go to the November 2007 summons. What did you do post-February 8th that made it clear that this was a malpractice claim you were, in effect, defending as opposed to just a sanctions claim? Well, the first thing, Your Honor, is we moved to exclude Mercy from filing those pleadings or making those requests for relief in the sanctions proceedings. We said it's inappropriate for them to be involved in this. But it turns out that's what you're hanging your hat on for the purpose of getting the verdict from the district court. Yes, that's true, Judge, but I had to be there to make those arguments. Someone has to be there on post's behalf to say, Mercy, get out of these proceedings. This is not the way you advance a malpractice claim. And to do that, you were defending. And that's the booty to defend that St. Paul's had. Now, the Luzerne Court wouldn't allow- So what did you file post-February 8th, 2006 that related to malpractice? Were the depositions concerning malpractice or were they concerning sanctions? They were identical, Judge, because what happened was Mercy said, My lawyer failed to make proper discovery disclosures contrary to the rules of civil procedure, and that's what forced me to proffer policy limits and settlement. And it's the very exact same conduct that the Bobbitts were saying entitled them to sanctions. So that if I'm in a deposition and the nurse who was involved in the actual production of the discovery says, And Mr. Post told me to do this, and Mr. Post said I didn't have to do that, that directly relates to the allegations that Mercy had made in its answer that post acted improperly. Just like in a criminal prosecution when the person is accused of something that's going to subject them to civil liability. I see a direct parallel there. I do too, but there's a very important distinction, Your Honor, and that is in that criminal context, your client is, policies of malpractice of insurance are not protect me against anything that could happen in the practice of law. It's simply protect me against my client saying I did something wrong. In the criminal context, my client's not saying I did anything wrong. Somebody else is. But here, my client's saying I did something wrong. I can give you a simple hypothetical of the contrary. Lawyer is accused of embezzlement. Right. Lawyer's charged criminally. Right. Lawyer defends the criminal case by saying I didn't steal the money, my partner did or my associate did. I mean. But in that context, Your Honor, his client is not making the allegations against him. The Commonwealth of Pennsylvania is. He says my client stole the money. But it's still not allegations being made by his client. The client may be a witness in those proceedings. If Mercy never joined these sanctions proceedings, St. Paul would have a lot stronger of an argument here. The problem they have is under their policy basically says you pay me premiums and if your client ever accuses you in a claim or suit of whatsoever type of acting negligently, I'll be there to defend you. And that's exactly what happened in those sanction proceedings. It doesn't happen in the criminal context. You don't have a whole lot of time left, but I was wondering about your bad faith claim. You've got a high hill to climb there. Here's. Actually, we'll add some time on for him. Oh, okay. And thank you, but I do agree. Before we go to bad faith, can we. I want to go back to where we were. Let's go ahead and talk first. I'm struggling with your argument about collateral consequences. Is it not the case that there is no precedent to support the notion that the sanctions proceeding might have caused adverse consequences to your client that could later be used against it? I can't find any case support for that proposition. And I can't either. What I'm struggling with is you arguing the four corners rule. As I understand it, your real argument or your lead argument, your principle argument, is that if you ask us to read the four corners of the answer, and therein contained, is a plea for damages that triggers coverage under the policy. Yes. Is that really. Absolutely, Judge. We have not advanced. Do we have to discern whether that wherefore clause, that prayer for damages clause, is sufficient to trigger full coverage under the policy? Right. And, Your Honor, we have not advanced that purely as a matter of collateral estoppel, the carriers bound. We have not advanced that argument. Now, there happens to be a collateral estoppel effect. And that's why, for example, once the malpractice claim is made, that malpractice lawyer, me, who should be being paid by St. Paul at that point, but who isn't, I have to be concerned with what the client's doing in other fora as to collateral estoppel. But that's not the reason. The reason is, is because that client is in a forum making a claim against me for damages. Thank you. Let me just go to the policy. The policy identifies the, quote, cost of the proceedings, close quote, involved in the suit. So it's got to be in the suit. As court reporters, arbitrators, and mediators fees. That's very, I mean, that's qualitatively different from attorney's fees. I agree, Judge. However. And attorney's fees is under a separate bullet point. So I'm not quite sure how the court here can necessarily talk about conflating. There's your conflation. Well, if I may just say so, though, Your Honor. There are other provisions of this policy that once the duty to defend arises, even if under only a claim. Forget the suit. Only under a claim. The carrier has the responsibility to pay counsel to defend and to investigate, Judge. Now that's their word. The carrier's word. That's not our word. They say investigate. Now if I'm the defense lawyer and my client receives the letter from Mercy setting forth a malpractice claim and I go about starting to investigate, that's my time. That's my effort. I charge legal fees for that. That is clearly contemplated by the policy. Let's skip ahead then. When you file the post case versus Mercy, that's a separate suit. That's not something that's involved in the proceeding brought against you. That's separate where you are the moving party. Are you claiming fees for that? Yes, sir. Why? Because the law in this circuit and most other circuits has refined itself to the following proposition. If you are a defense lawyer defending against a malpractice claim and you are being paid by the carrier, you have a responsibility not only to defend the affirmative allegations that are being made against your client, but if your client is in possession himself of claims against the plaintiff. Why don't you just assert a counterclaims? I mean, that would have made it very clear, but to file the separate suit, I mean, the reasoning that makes more sense to me is that by Judge Savage in the Amquip case. If courts, and this is a quote, if courts were to consider the cost and ensure it occurred by instituting its own action for the purpose of bringing pressure on the other party under the guise of litigation defense, it would encourage and endorse multiplicity of litigation. And I agree with that. I agree that that case says that, Judge, but I'll give you two reasons why it doesn't have to be a counterclaim. First, there's other case law that says it doesn't have to be a counterclaim as long as it's intimately wrapped into and intertwined with the facts. Secondly, though, Judge, and I was there so I can tell you personally, the reason we did not want to assert it as a counterclaim is because that counterclaim would have been in Luzerne County. Luzerne County was not the county we wanted to be in. We wanted to be in any county except Luzerne County. So as a defense lawyer, choosing not to make a counterclaim that could easily have been a counterclaim for other reasons is absolutely, in my client's best interest, is absolutely compelling to a defense lawyer in protecting his client and doing everything he can to see his client through this thing. And that's why I believe, Judge, the case law doesn't have a bright-line rule or a talismanic. If it's not a counterclaim, it automatically can't be involved. If it could be a counterclaim and there's a rational reason. But the language of the policies talks about involved in the proceeding. Yes. And you ain't involved in this proceeding? I mean, just on the four corners? I think the amount, if ‑‑ I mean, you're relying on four corners. You're saying for one proposition but not the other. Well, here's what I'm saying, though, Judge, and I want to address this very carefully if I could. When I bring the separate action in another county, I think the two are involved with each other because they deal with the same nucleus effects and the same exact ‑‑ Not in the same proceeding. Somebody is going to make a motion to consolidate. Now, the question will become, does it get consolidated in Luzerne or does it get consolidated in Philadelphia? I was hoping that I have a shot by filing in Philadelphia to get it consolidated in Philadelphia, and that would all be the same proceeding. Now, I realize, Judge, I agree with you that that takes it up the kind of strategic ladder a little bit in terms of what a carrier is responsible to do with a duty to defend. But I think under these circumstances, and that's one of the things that goes back to the very beginning of this, Judge, under these circumstances, St. Paul's conduct was characterized by putting their head in the sand. They didn't want to know this. They didn't want to hear about it. They didn't want to deal with it. They just said, you know what, I'm going to look at the Bobbitt's petition as sanctions with blinders on. Let me ask this final question on this before we get to the bad faith. Isn't the magic date that the sanctions and the malpractice claims were, according to you, conflated was February 8, 06? That is the latest date, yes. Because for the court to say what, November 21st, when the Bobbitt's filed their action, doesn't seem to make any sense. I mean, the first time Mercy came in was what, January 25th or so when they wanted to be in the deposition? Yeah. There are specific findings of fact, Judge, by the district court that Mercy was intricately involved, although it had not yet filed its pleading, were intricately involved in advancing that sanctions proceeding by participating in discovery, making discovery requests, insisting on deposing Ben Post and other witnesses in that proceeding. It was obvious. It was plain as the nose on my face, Judge, that Mercy Catholic was working on this sanctions model as a stalking horse for their preexisting malpractice claim. And I, as a defense lawyer, Judge, would have to be deaf, dumb, and blind, having been hired by Ben Post to be the malpractice lawyer, to not recognize what Mercy was doing at the time. You've just said they're imprudent, though. That's not necessarily a contractual breach. Here's, and if that goes to the bad faith. They should have been protecting their own interests, right? But there's nothing wrong with Mercy using it as a stalking horse. We've already agreed earlier that's what happens. Oh, from Mercy's point of view, they are at liberty to do that. Absolutely. And nothing in my position says that they shouldn't have somehow done all this. All I'm saying is, for goodness sakes, defend me. Give me the defense I need to deal with what Mercy's throwing at me. And when it comes to the bad faith, if I may, I don't know if Judge. Why don't you put on five minutes, and we'll deal with the bad faith. And, Judge, you're up. On bad faith, I mean, you've got a high hill to climb, right? I do, Judge. But here's why I think I climb it. First of all, Mr. Byer, in his brief, wants the panel to believe that the J.C. Penney two-pronged test is the only basis upon which a bad faith ruling can be sustained. And that's just not the case, because there are Third Circuit cases.  Which says, aside from the J.C. Penney test, if you have a deliberate failure to investigate, a deliberate failure to communicate with your insured. Well, wait a minute. You've got travelers. You're saying that they reflexively denied coverage. But they assigned this to a senior claim specialist. Who ignored it. Well, he reviewed the file. He hired outside counsel to provide a coverage opinion. Maybe he didn't give him all the information he should have at the outset. But you asked them to reconsider. I assume they did. You were in constant dialogue. The claims rep was in, or the person inside, was in constant dialogue with counsel for his counsel. And also his counsel was in constant dialogue with you throughout the course of this matter. And I've said to you at the outset of this, this is a toughie. How in the world can that be bad faith? Here's how, Judge, if I may. And with all due respect, when senior claims counsel gets involved, Mr. Spinelli at St. Paul's, he does one thing. He opens a file. Doesn't contact post, doesn't contact me, doesn't contact our office. I send him a series of letters. Look, things are happening. This is taking place. Come on, what's going on over there? The first thing he does, Judge, is he makes a decision that there's no coverage. And this is a specific finding by the district court. He makes a decision, there's no coverage, and I'm going to send it to Mr. Anish to get it confirmed by an outside lawyer, quote, unquote. That's the contact he makes. And when he sends it to Anish, he doesn't send him the claim. He loads the dice. And, Judge. Did the district court make a factual finding that that was some sort of Is there any factual finding to that effect? Didn't characterize it. But the district court did find specifically that when Spinelli sent the matter to outside counsel to confirm its denial position, he didn't include the malpractice claim with it. Well, that is a problem for them. But, I mean, isn't our standard here, do they have a reasonable basis for denying the coverage? And, you know, it was a sanctions action. But, Judge, if you agree with me that the district court acted correctly in entering summary judgment on the duty to defend because it's so plain that once that malpractice claim comes in that they had to deal with the sanctions proceeding when Mercy started pleading in it, if you agree that the summary judgment there was appropriate, then I think that it can't be characterized as a reasonable decision by Mercy not to defend. Well, it's two different standards you're dealing with. I agree. I agree. But from a factual point of view. It isn't just reasonable or unreasonable. They can be unreasonable with, you know, well-intentioned. The point is it has to be egregious conduct with the bad intention in order. I mean, that's why, as Judge Chigarro said, it's a high-heeled decline. Judge, I can think of nothing. And as you pointed out, this was senior claims counsel for St. Paul. For senior claims counsel to send it out to an attorney for an opinion and not send them the claim, I mean, in an insurance context, how do you get more intentional and bad intentions than that? How do you get more bad intentions by saying we don't know the – I mean. That's a finding of fact of the district court. That's something, an allegation you can make. But based on the record we have, it looks like there was a significant amount of involvement. Judge, the only contact they had with my office, and you can scour the record, was a .3 telephone call to one of my colleagues in my office. That is it. No letters in response, Judge. No request for more information. No appointment of a Pennsylvania lawyer to say, okay, let me dig into the facts. Let me see what's going on. None of that stuff took place. A .3 telephone call, Judge, in six months was the contact they had with our insured. That's not good faith. That's not carrying out your duty to investigate. Thank you very much. Thank you, Judge. Here for Mr. Beyer. And instead of three minutes, Marina, let's make it five. Thank you, Your Honor. Let me begin, with the Court's permission, with the bad faith issue, and I think we can dispose of that quickly. Because the briefing was so far in advance of the oral argument, of course, there have been recent decisions since then. I believe that a case that is completely dispositive of the bad faith issues is this Court's opinion, authored by Your Honor, Judge Ambrose, in the Amica Mutual Insurance Company v. Fogel case, which is 653, F-3rd, 167. Now you're going to tell him what he said and what he meant. I'm going to just. Even my mother wouldn't agree. I'm just going to refer the Court to the language at page 179 of that opinion in the F-3rd version, because it is completely dispositive of every issue we've just heard about on bad faith, including the fact that this is a tough case. Reasonable minds can differ, and that was involved in that case as well. And the summary judgment in that case on bad faith was affirmed, even though the coverage decision was reversed. The coverage issue was so unclear that your client offered to pay $36,000 in the sanctions proceeding. It was offering that as a compromise without prejudice to its position, and it made that very clear that this letter relates to the sanctions proceeding. This is an accommodation. We're not going to, and it says it has nothing to do with any subsequent malpractice case that might be filed. This was a business decision on the part of St. Paul travelers, because sometimes insurance carriers will, as a matter of their own business prudence, decide, well, maybe we will get involved in one of these collateral proceedings, even though it's not technically within our duty to defend, but it could affect us. We might have to pay out a large judgment. So if the potential claim has enough money in it and the policy limits are large enough, that's a business decision on the part of the carrier. It's not required by the policy. Even if we agree with or disagree with Mr. Boccetto's view that the prayer for relief in the answer filed by Mercy is enough to trigger full-blown coverage under the policy, don't we still have to give his client some money for the claim, the pre-existing claim? I mean, aren't they entitled to something? If work was done with respect to the claim, and first of all, there's an important distinction here also under the policy. The policy does not reserve to the insured the right to select counsel. There is nothing in this policy that gave Mr. Post the right to choose. Let me add on. That really is the crux of what the problem is. You've got a claim here, and I guess the court believing it as well, trial court, that counsel didn't disclose items under the rules that had to be disclosed. That can result in a malpractice claim. And, in fact, there were claims being made as far back as September 25. Or that could possibly result in a sanctions claim. As your co-counsel noted, the facts are the same for each of them. And your client started by saying, you better let your malpractice carrier know because we're coming after you. And then he says what happened was in the interim, there was this sanctions proceeding. And they even joined the sanctions proceeding, your client, for the purpose of whatever. And he's saying it's because the sanctions action was a stalking horse. Why can't a court find, as the trial court here did, that these are so intricately involved that the defense costs in effect for Mr. Boccetto's firm is covered throughout? Because we're violating the Four Corners Rule at that point, your Honor. Even extending it as Heffernan did to the proceedings in the discovery, Mercy itself disclaimed that it was seeking anything in the way of covered loss. You may be violating the Four Corners Rule with respect to the post of the Mercy separate action. You may be violating the Four Corners Rule with regard to the timing of when you kick in for the coverage. It may be February 8, 06, as opposed to November 21, 05. But you could still stay within the Four Corners if you do what I just said. But there's no proceeding based on that claim. There is an identity of facts which can come up in any number of hypothetical situations. You're in the clear on the suit aspect of the policy, but you're not in the clear on the claim aspect. If there were actions that were taken in defense of the claim as distinct, if you could separate the claim from the sanctions proceeding. And, by the way, there's no finding on the part of the district court with respect to this being a stalking horse. And the closest finding, which is actually truncated in a portion of one of the post briefs, is finding 28 in the June 16 opinion, which states that Mr. Boccetto believed that Mercy was aware of Mr. Quinn's actions, you know, before they were taken. But didn't the district court find that there was a claim, and that claim was involved in the sanctions proceeding? The district court did find that. I would suggest that that's a conclusion and not a finding. And that under this court's de novo review with respect to summary judgment, because that's where that was made, this court can see that in interpreting the policy it does not extend that far, that just because there's a commonality of facts. And there is no case that either the district court or any party has cited that supports that conclusion. Thank you very much. Thank you to both counsel for very well presented arguments. We'll take the matter under advisement. Thank you.